# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1653-CR & 2012AP520-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>    Plaintiff-Respondent,<br>  v.<br>Carlos A. Cummings,<br>    Defendant-Appellant-Petitioner.<br>-------------------------------------------------<br>State of Wisconsin,<br>    Plaintiff-Respondent,<br>  v.<br>Adrean L. Smith,<br>    Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 346 Wis. 2d 279
(Ct. App. 2013 – Unpublished)
-------------------------------------------------
REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 346 Wis. 2d 280, 827 N.W.2d 929
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 24, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 19, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit/Circuit |
| COUNTY: | Portage/Milwaukee |
| JUDGE: | Thomas T. Flugaur/Thomas P. Donegan |

| | |
|---|---|
| JUSTICES: | |
| CONCUR/DISSENT: | PROSSER, BRADLEY, JJ., concurs in part, dissents in part. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For defendant-appellant-petitioner Carlos A. Cummings, there were briefs by *David R. Karpe*, Madison, and oral argument by *David R. Karpe*.

For the plaintiff-respondent, the cause was argued by *Jacob J. Wittwer*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For defendant-appellant-petitioner Adrean L. Smith, there were briefs by *Dustin C. Haskell*, assistant state public defender, and oral argument by *Dustin C. Haskell*.

For the plaintiff-respondent, the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

2014 WI 88

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2011AP1653-CR & 2012AP520-CR
(L.C. Nos. 2008CF418 & 2010CF5837)

STATE OF WISCONSIN        :        IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

    v.

Carlos A. Cummings,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 24, 2014**

Diane M. Fremgen
Clerk of Supreme Court

State of Wisconsin,

      Plaintiff-Respondent,

    v.

Adrean L. Smith,

      Defendant-Appellant-Petitioner.

REVIEW of decisions of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of two per curiam decisions of the court of appeals, State v. Cummings, No. 2011AP1653-CR, unpublished slip op. (Wis. Ct. App. Jan. 10, 2013), and State v. Smith, No. 2012AP520-CR, unpublished slip op. (Wis. Ct. App. Jan. 23, 2013). In Cummings

the court of appeals affirmed the orders of the Portage County Circuit Court,[1] denying Carlos A. Cummings' ("Cummings") motion to suppress and motion for postconviction relief. In Smith the court of appeals affirmed the order of the Milwaukee County Circuit Court[2] denying Adrean L. Smith's ("Smith") motion to suppress.

¶2  Both Cummings and Smith argue that they unequivocally invoked the right to remain silent prior to making incriminating statements to police.[3] Both Smith and Cummings argue that, as a result, their incriminating statements should have been suppressed. Cummings separately argues that the circuit court should have granted his motion for postconviction relief because the sentence imposed on him was unduly harsh.

¶3  The State argues that neither Cummings nor Smith unequivocally invoked the right to remain silent, and further argues that Cummings' sentence was not unduly harsh.

¶4  We conclude that neither Cummings nor Smith unequivocally invoked the right to remain silent during their interrogations. As a result, the circuit court properly denied each defendant's motion to suppress the incriminating statements

---

[1] The Honorable Thomas T. Flugar presided.

[2] The Honorable Thomas P. Donegan presided.

[3] We note at the outset that in both cases, the asserted invocations of the right to remain silent occurred after the suspects had been taken into custody, had received Miranda warnings, had waived their Miranda rights, and were being interrogated by police. See Miranda v. Arizona, 384 U.S. 436 (1966).

2

made to police. We also conclude that Cummings' sentence was not unduly harsh. We therefore affirm the court of appeals in both cases.

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. State v. Cummings

¶5   On November 18, 2008, police responded to a reported shooting at a park in Stevens Point, Wisconsin. On arriving at the scene, officers found the victim, James Glodowski ("Glodowski"), conscious and responsive despite having been shot a number of times in the head and upper body.[4] Glodowski told police that he had been shot by a woman named "Linda," later identified as Linda Dietze ("Dietze").

¶6   Glodowski explained that Dietze had called him and asked him to meet her at the park. Dietze had told Glodowski during the call that she wanted to repay $600 that she had previously borrowed from him. Dietze also told Glodowski that she had video evidence of an affair between his wife, Carla Glodowski ("Carla"), and a man named "Carlos." When Glodowski arrived at the park, Dietze handed him the videotape, pulled out a .22 caliber pistol, and shot him. Before fleeing the scene on foot, Dietze told Glodowski that she was sorry for shooting him but that it was his wife's fault.

¶7   As part of their investigation, Stevens Point police officers interviewed Cummings on the afternoon of the shooting.

---

[4] As a result of the shooting, Glodowski lost the use of his eye. He continues to have a bullet lodged near his brain stem that cannot be removed surgically.

During his interview with police, Cummings denied any knowledge or involvement in the shooting, though he admitted that he was friendly with both Dietze and Carla. At this point, Cummings had not been arrested, nor had he been advised of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). Cummings was subsequently released.

¶8 Later that evening, police located Dietze at her apartment and arrested her. Dietze admitted to shooting Glodowski, but told police that meeting Glodowski at the park had been Cummings' idea. Dietze further stated that Cummings had driven her to and from the shooting, and that she had left a backpack containing the pistol used in the shooting in Cummings' vehicle. Officers also obtained surveillance footage of Dietze being dropped off at a gas station near her apartment after the shooting. The vehicle which dropped Dietze at the gas station was similar to Cummings' vehicle.

¶9 Following the interrogation of Dietze, police returned to Cummings' home and asked whether he would be willing to return to the station for further questioning. After being assured that he was still not in custody, Cummings agreed. Officers then transported Cummings back to the police station.

¶10 Following some preliminary questions, Cummings was advised of his Miranda rights. Cummings agreed, both orally and in writing, to waive those rights and speak with the officers. The officers then questioned Cummings about the inconsistency between his prior statements and the version of events given by

4

Dietze. During that discussion the following exchange took place:

> [OFFICER]: You've got a lot to lose, and at this point, I'm telling you right now Carlos, no . . . all bullshit aside, there's enough to charge you right now! Okay? This is your opportunity to be honest with me, to cut through all the bullshit and be honest about what you know.
>
> [CUMMINGS]: I'm telling you.
>
> [OFFICER]: So why then do we got Carla and [Dietze] telling us different?
>
> [CUMMINGS]: What are they telling you?
>
> [OFFICER]: I'm not telling ya! I'm not gonna fuckin' lay all my cards out in front of you Carlos and say, "This is everything I know!"
>
> [CUMMINGS]: Well, then, take me to my cell. Why waste your time? Ya know?
>
> [OFFICER]: Cuz I'm hoping . . .
>
> [CUMMINGS]: If you got enough . . .
>
> [OFFICER]: . . . to get the truth from ya.
>
> [CUMMINGS]: If you got enough to fuckin' charge me, well then, do it and I will say what I have to say, to whomever, when I plead innocent. And if they believe me, I get to go home, and if they don't . . .
>
> [OFFICER]: If who believes you?
>
> [CUMMINGS]: . . . and if they don't, I get locked up.

¶11 The interrogation continued and Cummings eventually admitted that he had driven Dietze to a location near the park where the shooting had occurred. Cummings further stated that, when Dietze returned to Cummings' car she told him that she had

5

shot someone and asked to be taken home. Cummings admitted that Dietze left her backpack with him but claimed that he found only Dietze's wallet and keys inside. Cummings denied that he knew Dietze intended to shoot Glodowski before driving her to the park. He further denied that he ever possessed the gun used in the shooting. Cummings was then informed that he was being placed on a probation hold.[5]

¶12 Police then questioned Carla regarding the shooting. Carla claimed to be having an affair with Cummings.[6] She stated that her husband would never grant her a divorce. Carla explained that she and Cummings planned to have a third person shoot and kill her husband so that they could collect his life insurance policy and then flee together. Carla admitted her part in the plan, which included a contribution of money towards hiring the shooter.

---

[5] At the time of the shooting, Cummings was on probation term for three misdemeanor convictions of issuing worthless checks, contrary to Wis. Stat. § 943.23(1) (2007-08).

[6] Subsequent investigation would reveal that Cummings and Carla were not, in fact, having an affair. Rather, it appears from the record that Cummings was using Carla's affection for him to secure the proceeds of her husband's life insurance policy and never intended to have a relationship with her. This fact, along with Dietze's documented mental health issues, supports the circuit court's later conclusion that Cummings "was using two women [who] were basically . . . cognitively disabled for financial gain."

6

¶13 On November 19, 2008, the day following the shooting, police conducted a search of Cummings' home.[7] The search uncovered a case and magazine for a .22 caliber Smith & Wesson pistol, and five .22 caliber shell casings hidden in the basement. A subsequent search of the garage revealed the .22 caliber Smith & Wesson pistol used to shoot Glodowski hidden in a box.

¶14 On December 2, 2008, Cummings made his initial appearance on a criminal complaint filed by the State. The complaint charged Cummings with Attempted First Degree Intentional Homicide As a Party to the Crime, contrary to Wis. Stat. §§ 939.05, 939.32, and 940.01(1) (2007-08),[8] a Class B felony. On December 17, 2008, the court held a preliminary hearing and bound Cummings over for trial.

¶15 On January 5, 2009, Cummings was arraigned on the information which charged him with one count of Attempted First Degree Intentional Homicide With a Dangerous Weapon, As a Party to the Crime, contrary to Wis. Stat. §§ 939.05, 939.32, 939.63, and 940.01(1), a Class B felony, and two counts of Aiding a Felon, contrary to § 946.47(1)(a) and (b), a Class G felony. Due to Cummings' prior convictions for passing worthless checks, all three charges included habitual criminal penalty enhancers

---

[7] Cummings had provided his consent for the search the previous day, and thus no warrant was required. State v. Sobczak, 2013 WI 52, ¶11, 347 Wis. 2d 724, 833 N.W.2d 59 (citing Georgia v. Randolph, 547 U.S. 103, 109 (2006)).

[8] All subsequent references to the Wisconsin Statutes in this section of the opinion are to the 2007-08 version.

7

pursuant to Wis. Stat. § 939.62.  Cummings entered pleas of not guilty to all three charges.

¶16  On November 25, 2009, Cummings filed a motion to suppress all the statements he made to police prior to being given Miranda warnings and all the statements he made to police after he asked, "Well, then, take me to my cell.  Why waste your time?  Ya know?" during his interrogation.

¶17  In support of his motion, Cummings asserted that he was "in custody" prior to being given Miranda warnings, and that he had unequivocally invoked his right to remain silent when he asked to be taken to a cell.  He therefore argued that allowing the prosecution to use those statements would violate his right against self-incrimination.  See U.S. Const. amend. V; Wis. Const. Art. I, § 8.

¶18  The State opposed Cummings' motion.  The State argued that Cummings was not in custody at the time the interrogation began, and was not interrogated until after he had received Miranda warnings.  The State further argued that Cummings' statement——"Well, then, take me to my cell.  Why waste your time?  Ya know?"——was not an unequivocal invocation of his right to remain silent.

¶19  On December 2, 2009, the court held a hearing on Cummings' motion.  With respect to the first issue, the court concluded that Cummings was "in custody" prior to being read Miranda warnings and that a brief portion of the interrogation occurred prior to Cummings being given the warnings.  The court

therefore suppressed the "limited responses" that Cummings gave to police prior to being given <u>Miranda</u> warnings.

¶20 On second issue, however, the court concluded that Cummings' statement was not an unequivocal invocation of the right to remain silent, and therefore denied his motion to suppress. The court determined, relying on <u>State v. Markwardt</u>, 2007 WI App 242, 306 Wis. 2d 420, 742 N.W.2d 546, that Cummings was "clearly" making an "attempt[] to get information from the detectives" and was thus not attempting to end the interrogation.

¶21 On January 8, 2010, Cummings pled no contest to First Degree Reckless Injury, As a Party to the Crime, contrary to Wis. Stat. §§ 939.05 and 940.23(1), a Class D felony, pursuant to a plea agreement.[9] In exchange for Cummings' plea, the State agreed to dismiss and read in the remaining counts for sentencing purposes and to dismiss the penalty enhancers. The court accepted Cummings' plea, adjudged him guilty, and ordered a presentence investigation report.

¶22 On March 5, 2010, the circuit court sentenced Cummings to 24 years of imprisonment, with 14 years of initial confinement to be followed by 10 years of extended supervision. The court further ordered that Cummings pay $110,188.37 in restitution to Glodowski.

---

[9] The State filed an amended information on the day of Cummings' no contest plea which substituted the charge of Attempted First Degree Intentional Homicide with the charge of First Degree Reckless Injury.

¶23 On December 13, 2010, Cummings filed a motion for postconviction relief in the circuit court. In his motion, Cummings alleged that his trial counsel had been ineffective for failing to ask the court for a risk reduction sentence, and that the sentence imposed by the court was unduly harsh. On this basis, Cummings asked to be resentenced or alternatively, for a modification of his sentence. Cummings subsequently added a request that the court vacate the DNA surcharge it had imposed, pursuant to State v. Cherry, 2008 WI App 80, 312 Wis. 2d 203, 752 N.W.2d 393.

¶24 On July 1, 2011, the circuit court granted in part and denied in part Cummings' postconviction motion. The court granted the portion of Cummings' motion related to the DNA surcharge, but denied his request for resentencing or sentence modification. The court rejected Cummings' claim that his trial counsel had been ineffective for failing to request a risk reduction sentence. The court concluded that, given the seriousness of the offense, requesting a risk reduction sentence would have been "a complete waste of time." The court further concluded that the sentence it had imposed was not unduly harsh:

> [T]his court rarely gives a sentence that is maximum or something close to the maximum.
>
> But in this case, it felt that it was required, it was necessary, or it would unduly depreciate the seriousness of the offense, and there was a real need to protect the public. When the court finally learned what the motive was behind this, it was rather shocked that Mr. Cummings was using two women [who] were basically . . . cognitively disabled for financial gain.

10

¶25 On July 15, 2011, Cummings appealed both his conviction and the court's denial of his motion for postconviction relief. Cummings argued that the circuit court had erred in concluding that his statement——"Well, then, take me to my cell. Why waste your time? Ya know?"——was not an unequivocal invocation of his right to remain silent. Cummings further argued that the sentence imposed by the circuit court was unduly harsh.

¶26 On January 10, 2013, the court of appeals affirmed the circuit court in all respects. Cummings, No. 2011AP1653-CR, unpublished slip op., ¶1.

¶27 The court of appeals first concluded that Cummings' statement was not an unambiguous invocation of the right to remain silent. The court found that "a competing, and indeed more compelling, interpretation [of Cummings' statement] is that he was merely attempting to obtain more information from the police about what his co-conspirators had been saying." Id., ¶9. Because Cummings' statement was subject to a "reasonable competing inference" the court concluded that it was not unambiguous. Id., ¶7 (citing Markwardt, 306 Wis. 2d 420, ¶36).

¶28 The court further concluded that Cummings' sentence was not unduly harsh, finding that "a sentence of fourteen years of initial confinement and ten years of supervision, for involvement in an offense that left the victim with the loss of an eye and a bullet lodged near his brain stem, does not shock the conscience of this court." Id., ¶14.

11

¶29 On February 15, 2013, Cummings petitioned this court for review, which we granted on December 17, 2013.

### B. State v. Smith

¶30 In late November 2010 Smith was interviewed by Milwaukee Police Department Detective Travis Guy ("Detective Guy") regarding a series of violent armed robberies involving a stolen van.[10] At the outset, Smith was given Miranda warnings and agreed to waive his rights and speak to police. Smith then discussed his involvement in the theft of the van, and readily answered Detective Guy's questions.

¶31 When Detective Guy began asking about the armed robberies, however, Smith stated as follows:

> Smith: See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this.
>
> Detective Guy: Okay.
>
> Smith: I don't know nothing. See, look, I'm talking about this van. I don't know nothing about no robbery.[11] Or no -- what's the other thing?
>
> Detective Guy: Hmmm?
>
> Smith: What was the other thing that this is about?

---

[10] The record does not reveal the precise date of Detective Guy's initial interview with Smith.

[11] The context of this statement, following extensive discussion of Smith's knowledge of the stolen van, and his later statement——"I'm talking about this van. This stolen van."—— strongly indicate that Smith intended this sentence to convey that he didn't know anything about the involvement of a van in any robberies.

Detective Guy: Okay.

Smith: I don't want to talk . . . I don't know nothing about this, see. That's --I'm talking about this uh van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this.

Detective Guy: I got a right to ask you about it.

. . .

Smith: I don't know nothing about this. I'm here for the van.

. . .

Detective Guy: You don't know anything about this robbery that happened at [address] on the 23rd of November where a woman was approached . . . ?

Smith: No. Uh-uh. I don't know nothing about this.

¶32 Following this exchange, Detective Guy returned his questioning to the topic of the stolen van. Later during the interrogation, Detective Guy again returned to the topic of the robberies, asking Smith "do you want to tell me about [the robberies]?" Smith replied, "What I got to do with it? What that got to do with me? I don't know nothing about no robbery, see, that's what I'm saying! I don't rob people." Detective Guy continued to ask Smith for information, and Smith subsequently admitted his involvement in the armed robberies.

¶33 On November 29, 2010, the State filed a criminal complaint against Smith charging him with seven counts of Armed Robbery, as a Party to the Crime, contrary to Wis. Stat.

13

§§ 943.32(2), 939.50(3)(c), and 939.05 (2009-10),[12] a Class C felony; three counts of Possession of a Firearm by a Felon, contrary to Wis. Stat. §§ 941.29(2)(b) and 939.50(3)(g), a Class G felony; two counts of Attempted Armed Robbery, as a Party to the Crime, contrary to Wis. Stat. §§ 943.32(2), 939.50(3)(c), 939.05, and 939.32, a Class C felony; two counts of Burglary, as a Party to the Crime, by Use of a Dangerous Weapon, contrary to Wis. Stat. §§ 943.10(2)(e), 939.50(3)(e), 939.05, and 939.63(1)(b), a Class E felony; two counts of False Imprisonment, as a Party to the Crime, by Use of a Dangerous Weapon, contrary to Wis. Stat. §§ 940.30, 939.50(3)(h), 939.05, and 939.63(1)(b), a Class H felony; one count of First Degree Reckless Injury by Use of a Dangerous Weapon, contrary to Wis. Stat. §§ 940.23(1)(a), 939.50(3)(d), and 939.63(1)(b), a Class D felony; and one count of Operating a Vehicle Without the Owner's Consent, contrary to Wis. Stat. §§ 943.23(3), and 939.50(3)(i), a Class I felony.

¶34 On November 30, 2010, Smith made his initial appearance. Smith received a copy of the complaint, and waived its reading. The court found probable cause to continue holding Smith, and set cash bail of $200,000. On December 9, 2010, Smith waived his right to a preliminary hearing.

¶35 On January 10, 2011, Smith was arraigned on the Information, which charged him with six counts of Armed Robbery,

---

[12] All subsequent references to the Wisconsin Statutes in this section are to the 2009-10 version.

as a Party to the Crime, contrary to Wis. Stat. §§ 943.32(2), 939.50(3)(c), and 939.05, a Class C felony; and one count of First Degree Reckless Injury While Armed, contrary to Wis. Stat. §§ 940.23(1)(a), 939.50(3)(d), and 939.63(1)(b), a Class D felony. Smith acknowledged receipt of the Information, waived its reading, and pled not guilty to all counts.

¶36 On March 30, 2011, Smith filed a motion to suppress the statements he made to Detective Guy regarding the robberies. Smith argued that he had unequivocally invoked his right to remain silent prior to admitting his involvement in the crimes, and that his statements had been the product of coercion on the part of Detective Guy.

¶37 The State opposed Smith's motion, arguing that Smith's statements regarding the right to remain silent were ambiguous and that his admissions had not been obtained through coercion.

¶38 On July 14, 2011, the circuit court held a hearing on Smith's motion to suppress. After hearing brief argument from the parties, the court denied Smith's motion. With respect to Smith's invocation of the right to remain silent, the court concluded that "[t]he defendant did not clearly assert his right to remain silent. There was ambiguity." The court further rejected Smith's argument regarding coercion, stating that it "didn't find anything close to what would be considered coercive tactics under the case law."

¶39 On July 27, 2011, Smith pled guilty to three counts of armed robbery and one count of first degree reckless injury, pursuant to a plea agreement. In exchange for Smith's pleas,

15

the State agreed to dismiss and read in the remaining counts for sentencing purposes. The court accepted Smith's pleas and adjudged him guilty. The court then sentenced Smith to 35 years imprisonment, with 25 years initial confinement to be followed by 10 years of extended supervision.

¶40 On March 8, 2012, Smith appealed his convictions, again arguing that he unambiguously invoked his right to remain silent and that his incriminating statements should have been suppressed.

¶41 On January 23, 2013, the court of appeals affirmed. Smith, No. 2012AP520-CR, unpublished slip op., ¶1. The court concluded that Smith was not attempting to terminate the interview when he made his statements, but was rather indicating that he did not wish to discuss one particular line of questions. Id., ¶9. Because Smith continued his conversation with police despite stating that he "[didn't] want to talk about this," he had not unequivocally invoked his right to remain silent. Id., ¶8.

¶42 On February 21, 2013, Smith petitioned this court for review, which we granted on December 17, 2013.

II. STANDARD OF REVIEW

¶43 Whether a person has invoked his or her right to remain silent is a question of constitutional fact. Markwardt, 306 Wis. 2d 420, ¶30 (citing State v. Jennings, 2002 WI 44, ¶20, 252 Wis. 2d 228, 647 N.W.2d 142; State v. Moats, 156 Wis. 2d 74, 94, 457 N.W.2d 299 (1990)).

16

¶44 "When presented with a question of constitutional fact, this court engages in a two-step inquiry." State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463 (citations omitted). "First, we review the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous." Id. (citations omitted). "Second, we independently apply constitutional principles to those facts." Id. (citations omitted).

¶45 "'We review a trial court's conclusion that a sentence it imposed was not unduly harsh and unconscionable for an erroneous exercise of discretion.'" State v. Grindemann, 2002 WI App 106, ¶30, 255 Wis. 2d 632, 648 N.W.2d 507 (emphasis in original) (quoting State v. Giebel, 198 Wis. 2d 207, 220, 541 N.W.2d 815 (Ct. App. 1995)). "We will not set aside a discretionary ruling of the trial court if it appears from the record that the court applied the proper legal standards to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach." Id. (citing Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982)).

III. ANALYSIS

A. The Right to Remain Silent

¶46 "Both the United States and Wisconsin Constitutions protect persons from state compelled self-incrimination." State v. Hall, 207 Wis. 2d 54, 67, 557 N.W.2d 778 (1997); see also

17

U.S. Const. amend. V; Wis. Const. art. I, § 8.[13]  In order to protect suspects from the "inherently compelling pressures" of custodial interrogation, the United States Supreme Court has developed procedural guidelines to be followed by police during such interrogations.  See Miranda, 384 U.S. at 467; see also Markwardt, 306 Wis. 2d 420, ¶23.  "A suspect's right to counsel and the right to remain silent are separately protected by these procedural guidelines."  Markwardt, 306 Wis. 2d 420, ¶23 (citing Miranda, 384 U.S. at 467–73).

¶47 After a suspect has been taken into custody, given the Miranda warnings, and waived his Miranda rights, the right to remain silent still guarantees a suspect's "right to cut off questioning" during a custodial interrogation.  Id., ¶24 (citing Michigan v. Mosley, 423 U.S. 96, 103-04 (1975)).

¶48 Under these circumstances, a suspect must "unequivocally" invoke the right to remain silent in order to "cut off questioning."  See Berghuis v. Thompkins, 560 U.S. 370, 386 (2010)(quotation marks omitted); Markwardt, 306 Wis. 2d 420,

---

[13] This court has previously held that "[t]he state constitutional right against compulsory self-incrimination is textually almost identical to its federal counterpart."  State v. Jennings, 2002 WI 44, ¶40, 252 Wis. 2d 228, 647 N.W.2d 142. Where "the language of the provision in the state constitution is 'virtually identical' to that of the federal provision or where no difference in intent is discernible, Wisconsin courts have normally construed the state constitution consistent with the United States Supreme Court's construction of the federal constitution."  State v. Agnello, 226 Wis. 2d 164, 180-81, 593 N.W.2d 427 (1999) (citing State v. Tompkins, 144 Wis. 2d 116, 133, 423 N.W.2d 823 (1988); Kenosha County v. C&S Management, Inc., 223 Wis. 2d 373, 588 N.W.2d 236 (1999)).

18

¶26 (citing State v. Ross, 203 Wis. 2d 66, 75-79, 552 N.W.2d 428 (Ct. App. 1996)); see also Fifth Amendment-Invocation of the Right to Cut Off Questioning, 124 Harv. L. Rev. 189, 196-97 (2010).

¶49 This standard, sometimes called the "clear articulation rule," was originally developed by the United States Supreme Court to govern invocation of the right to counsel. See Davis v. United States, 512 U.S. 452 (1994). In State v. Ross, the Wisconsin Court of Appeals extended the rule to cover invocations of the right to remain silent, requiring suspects to "unequivocally" invoke the right in order to cut off questioning by police. Ross, 203 Wis. 2d at 70.

¶50 Recently, the Supreme Court confirmed that invocation of the right to counsel and invocation of the right to cut off questioning both required unequivocal invocation by a suspect. See Berghuis, 560 U.S. at 381-82 (citing Davis, 512 U.S. at 459). Berghuis further confirmed that the unequivocal invocation standard is an objective test. 560 U.S. at 381; see also Davis, 512 U.S. at 458-59.

¶51 If a suspect's statement is susceptible to "reasonable competing inferences" as to its meaning, then the "suspect did not sufficiently invoke the right to remain silent." Markwardt, 306 Wis. 2d 420, ¶36 (citation omitted). If a suspect makes such an ambiguous or equivocal statement, "police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her Miranda

19

rights." Berghuis, 560 U.S. at 381 (citing Davis, 512 U.S. at 461-62).

¶52 Once a suspect has invoked the right to remain silent "all police questioning must cease——unless the suspect later validly waives that right and 'initiates further communication' with the police." Ross, 203 Wis. 2d at 74 (quoting Miranda, 384 U.S. at 473-74; Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). Thus, the "key question" is whether the suspect unequivocally invoked the right to cut off questioning during the interrogation. Markwardt, 306 Wis. 2d 420, ¶25 (citing Ross, 203 Wis. 2d at 74).

### 1. State v. Cummings

¶53 Cummings argues that his statement——"Well, then, take me to my cell. Why waste your time? Ya know?"——constituted an unequivocal invocation of his right to remain silent, and thus, should have served to cut off further questioning. We disagree.

¶54 In the context of the ongoing back and forth between Cummings and the officers, this statement was susceptible to at least two "reasonable competing inferences" as to its meaning. Markwardt, 306 Wis. 2d 420, ¶36. Cummings is correct that his statement could be read literally: as a request that he be removed from the room because he was no longer interested in talking to the officers. Another possibility, however, is that his statement was a rhetorical device intended to elicit additional information from the officers about the statements of his co-conspirators. Indeed, the plain language of the statement seems to be an invitation to the officer to end the

20

interrogation, presumably because continued questioning would prove fruitless unless the officer provided additional information to Cummings. Such a statement is not an unequivocal assertion that Cummings wanted to end the interrogation.

¶55 Both the circuit court and the court of appeals considered this second interpretation to be the more compelling one of the two. See Cummings, No. 2011AP1653, unpublished slip op., ¶8. We need not choose one as more compelling than the other in order to conclude that Cummings' statement was not an unequivocal invocation of the right to remain silent. See Markwardt, 306 Wis. 2d 420, ¶36.

¶56 Cummings further argues that his statement was an unequivocal invocation because it was very similar to the statements of the suspect in State v. Goetsch, 186 Wis. 2d 1, 519 N.W.2d 634 (1994). In Goetsch the suspect stated, "I don't want to talk about this any more. I've told you, I've told you everything I can tell you. You just ask me any questions and I just want to get out of here. Throw me in jail, I don't want to think about this." Id. at 7. The court of appeals in Goetsch concluded that this statement constituted an unequivocal invocation of the right to remain silent. Id. at 7-9.

¶57 While the statement in Goetsch is superficially similar to the one at issue in this case, there are critical differences. First, the suspect in Goetsch, in addition to referencing jail, clearly stated that he did not wish to speak with police. Cummings did not make any such additional statements. Second, the suspect in Goetsch expressed that he

21

was exhausted, and he had disengaged from the conversation. Cummings, on the other hand, made his statement while verbally sparring with police. Finally, the suspect in Goetsch had nothing to gain from being thrown in jail except the end of the interview. Thus his statement is not susceptible to any "reasonable competing inferences" as to its meaning. Markwardt, 306 Wis. 2d 420, ¶36. As we have discussed, this is not the case with Cummings' statement.

¶58 In fact, Cummings' statement in the case at issue is more similar, in terms of context, to the statement in Markwardt than the one in Goetsch. In Markwardt the suspect stated "[t]hen put me in jail. Just get me out of here. I don't want to sit here anymore, alright. I've been through enough today." Markwardt, 306 Wis. 2d 420, ¶35. The suspect in Markwardt made her statement during a sequence of verbal "fencing," wherein the interrogating officer repeatedly caught the suspect "in either lies or at least differing versions of the events." Id., ¶36. Because of this context, the court of appeals concluded that the suspect's statement was subject to "reasonable competing inferences" as to its meaning. As a result, the court of appeals concluded that the suspect's statement was not an unequivocal invocation of the right to remain silent, and thus did not serve to cut off questioning. Id.

¶59 Cummings' statement——"Well, then, take me to my cell. Why waste your time? Ya know?"——similarly occurred during a period of verbal back and forth between Cummings and the officers, and is thus similarly subject to reasonable competing

22

inferences. As a result of these competing inferences, we conclude that Cummings' statement was not an unequivocal invocation of the right to remain silent. We therefore affirm the court of appeals.

## 2. State v. Smith

¶60 Smith argues that his statement——"See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this."——in response to Detective Guy's questions constituted an unequivocal invocation of his right to remain silent. Smith further notes that he repeated his assertion that he didn't want to talk three different times within the space of just a few sentences.

¶61 We agree that, standing alone, Smith's statements might constitute the sort of unequivocal invocation required to cut off questioning, and we further acknowledge that Smith's statement presents a relatively close call. In the full context of his interrogation, however, Smith's statements were not an unequivocal invocation of the right to remain silent.

¶62 When placed in context it is not clear whether Smith's statements were intended to cut off questioning about the robberies, cut off questioning about the minivan, or cut off questioning entirely. Some of Smith's statements are also exculpatory statements or assertions of innocence, which do not indicate a desire to end questioning at all. Prior to Smith's statement, Detective Guy had been asking Smith about his involvement in the theft of the minivan. Smith had been

23

participating in this portion of the questioning in a fairly straightforward and cooperative fashion.

¶63 When the topic of the armed robberies came up, Smith stated, "I don't want to talk about this" four times, but also stated, "I don't know nothing about this" a total of seven times. In some instances Smith seems to mean the van when he uses the words "this" or "that," but in other instances it seems he means the robberies. In listening to the recording of the interrogation, it seems that he meant to refer to the robberies but this is not the only interpretation.

¶64 Further, while "I don't want to talk about this" seems to indicate a desire to cut off questioning, "I don't know nothing about this" is an exculpatory statement proclaiming Smith's innocence. Such a proclamation of innocence is incompatible with a desire to cut off questioning.

¶65 Given the apparent confusion, and although he was not required by law to do so, Detective Guy gave Smith an opportunity to clarify his statements when he asked, "Do you want to tell me about [the robberies]?" In response, Smith again proclaimed his innocence, stating: "I don't know nothing about no robbery, see, that's what I'm saying! I don't rob people."

¶66 Smith's own words also indicated a continued willingness to answer questions. Following the statement that Smith emphasizes——"See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this."——Smith also stated: "I'm talking about this van. This stolen van. I

24

don't know nothing about this stuff . . . I don't know nothing about this. I'm here for the van." These additional statements indicate that Smith was willing to continue answering questions about the van, but was unwilling, or perhaps unable, to answer questions about the robberies.

¶67 "[A] defendant may selectively waive his Miranda rights, deciding to 'respond to some questions but not others.'" State v. Wright, 196 Wis. 2d 149, 156, 537 N.W.2d 134 (Ct. App. 1995) (quoting Bruni v. Lewis, 847 F.2d 561, 563 (9th Cir. 1988)). Such selective "refusals to answer specific questions," however, "do not assert an overall right to remain silent." Id. at 157 (citing Fare v. Michael C., 442 U.S. 707, 726–27 (1979)).

¶68 Finally, our determination regarding the meaning of Smith's statement need not be definitive to conclude that he did not unequivocally invoke the right to remain silent. The mere fact that Smith's statements could be interpreted as proclamations of innocence or selective refusals to answer questions is sufficient to conclude that they are subject to "reasonable competing inferences" as to their meaning. Markwardt, 306 Wis. 2d 420, ¶36.

¶69 Thus, under the facts and circumstances of the case at issue, Smith did not unequivocally invoke his right to remain silent, such that police were required to cut off their questioning. We therefore affirm the court of appeals.

B. Unduly Harsh Sentence

¶70 "Within certain constraints, Wisconsin circuit courts have inherent authority to modify criminal sentences." State v.

25

Harbor, 2011 WI 28, ¶35, 333 Wis. 2d 53, 797 N.W.2d 828 (citing State v. Hegwood, 113 Wis. 2d 544, 546, 335 N.W.2d 399 (1983)). A circuit court may not, however, modify a sentence merely "on reflection and second thoughts alone." Harbor, 333 Wis. 2d 53, ¶35 (citing State v. Wuensch, 69 Wis. 2d 467, 474, 480, 230 N.W.2d 665 (1975)). Ordinarily a defendant seeking a sentence modification must show the existence of a "new factor" unknown to the court at the time of sentencing. See, e.g., State v. Ninham, 2011 WI 33, ¶88, 333 Wis. 2d 335, 797 N.W.2d 451.

¶71 In the absence of a new factor, a circuit court has authority to modify a sentence only under certain narrow circumstances. Among those circumstances is if "the court determines that the sentence is unduly harsh or unconscionable." Harbor, 333 Wis. 2d 53, ¶35 n.8 (citing State v. Crochiere, 2004 WI 78, ¶12, 273 Wis. 2d 57, 681 N.W.2d 524; Wuensch, 69 Wis. 2d 467; State v. Ralph, 156 Wis. 2d 433, 438, 456 N.W.2d 657 (Ct. App. 1990)).[14]

¶72 A sentence is unduly harsh or unconscionable "only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances."

---

[14] The circuit court may also modify a sentence without a new factor if it determines that the sentence originally imposed was illegal or void, State v. Crochiere, 2004 WI 78, ¶12, 273 Wis. 2d 57, 681 N.W.2d 524, or if it relied on inaccurate information when it imposed the original sentence. State v. Tiepelman, 2006 WI 66, ¶26, 291 Wis. 2d 179, 717 N.W.2d 1.

Ocanas v. State, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975) (citations omitted).

¶73 Cummings argues that his sentence of 14 years of initial confinement to be followed by 10 years of extended supervision was unduly harsh.  Cummings asserts that "near maximum sentences" are "deserving of greater scrutiny than sentences well within the normal statutory limits."  Cummings claims that "[s]uch sentences may be due to the erroneous exercise of discretion."  We agree with the court of appeals that Cummings' sentence was not unduly harsh.

¶74 Cummings is correct that "[a] sentence well within" the statutory limits is unlikely to be "so disproportionate to the offense committed as to shock the public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances."  State v. Daniels, 117 Wis. 2d 9, 22, 343 N.W.2d 411 (Ct. App. 1983) (citing Ocanas, 70 Wis. 2d at 185).  Near maximum sentences are not, however, automatically suspect.

¶75 "'What constitutes adequate punishment is ordinarily left to the discretion of the trial judge.  If the sentence is within the statutory limit, appellate courts will not interfere unless clearly cruel and unusual.'"  Ninham, 333 Wis. 2d 335, ¶85 (citation omitted).  Further, we will not disturb the exercise of the circuit court's sentencing discretion so long as "it appears from the record that the court applied the proper legal standards to the facts before it, and through a process of

27

reasoning, reached a result which a reasonable judge could reach." Grindemann, 255 Wis. 2d 632, ¶30 (citation omitted).

¶76 In the case at issue, the circuit court stated the proper legal standards to be considered at sentencing. See State v. Gallion, 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197. The circuit court stated the reasons for the severe sentence on the record, stating:

> [T]his court rarely gives a sentence that is maximum or something close to the maximum.
>
> But in this case, it felt that is was required, it was necessary, or it would unduly depreciate the seriousness of the offense, and there was a real need to protect the public.

¶77 Finally, while it is true that not every judge would impose a maximum or near maximum sentence for the offenses Cummings committed, it is hard to say that no reasonable judge would do so. As a result, we conclude that the circuit court did not erroneously exercise its discretion and we affirm the court of appeals.

## IV. CONCLUSION

¶78 We conclude that neither Cummings nor Smith unequivocally invoked the right to remain silent during their interrogations. As a result, the circuit court properly denied each defendant's motion to suppress the incriminating statements made to police. We also conclude that Cummings' sentence was not unduly harsh. We therefore affirm the court of appeals in both cases.

28

*By the Court.*—The decisions of the court of appeals are affirmed.

¶79 DAVID T. PROSSER, J. *(concurring in part, dissenting in part).* In these cases, two defendants claim that they effectively asserted their right to remain silent. The majority concludes that both defendants failed. Majority op., ¶4. I agree with the majority that Carlos Cummings failed to unequivocally invoke his Fifth Amendment[1] right to remain silent after receiving a <u>Miranda</u>[2] warning, majority op., ¶4, and I join the majority opinion with respect to its Cummings analysis. However, I do not agree with the majority's conclusion that Adrean Smith (Smith) did not unequivocally invoke his right to remain silent when he said, "I don't want to talk about this." Accordingly, with respect to Adrean Smith, I respectfully dissent.

¶80 Detective Travis Guy (Detective Guy) of the Milwaukee Police Department conducted an interrogation of Smith regarding armed robberies that involved a stolen van. The majority quotes the exchange in paragraph 31. After Smith initially waived his <u>Miranda</u> rights, he talked briefly about the stolen van and then said, "That's pretty much all I can say."

¶81 Detective Guy proceeded to talk about an armed robbery, and Smith responded by saying, "See, I don't want to talk about, I don't want to talk about this." He also said, "I don't even want to talk about——I don't know nothing about this,

---

[1] "No person shall be . . . compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V.

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

1

see.  I'm talking about this van. . . .   So, I don't want to talk about this."

¶82  Detective Guy responded, "I got a right to ask you about it."  Detective Guy then continued to question Smith.

¶83  Detective Guy did not have "a right" to question Smith after Smith said he did not want to talk.  The detective's statement to the contrary undercut the defendant's constitutional right to remain silent.[3]  Despite initially informing Smith that he had "the right to stop the questioning or remain silent at any time [he] wish[ed]," Detective Guy ignored a clear statement that Smith did not want to talk.

¶84  The majority concludes that Smith's statements were equivocal because, although he said "I don't want to talk about this" four times, according to the majority, it was unclear whether "this" was referring to the van, the robberies, or the interrogation in general.  Majority op., ¶63.  I disagree.  True confusion can be remedied with follow-up questions.  Even if not required, clarifying questions reduce the risk that further inquiry will violate the suspect's constitutional rights when an officer truly believes a suspect's statement was ambiguous.

¶85 The statements in this case are not appreciably different from the statements in State v. Goetsch, 186

---

[3] An officer's assertion of authority in response to a defendant's assertion of a constitutional right is troubling when the asserted authority contradicts the right.  See State v. Wantland, 2014 WI 58, ¶27, ___ Wis. 2d ___, ___ N.W.2d ___ (Prosser, J., dissenting).  When Detective Guy asserted that he had a right to question Smith, he effectively precluded Smith from asserting his right to end questioning.

2

Wis. 2d 1, 7, 519 N.W.2d 634 (Ct. App. 1994). In Goetsch, the defendant said, "I don't want to talk about this anymore. I've told you, I've told you everything I can tell you. You just ask me any questions and I just want to get out of here. Throw me in jail, I don't want to think about this." Id. Despite the fact that Goetsch continued to speak after he said he did not want to talk, the court of appeals determined that he had invoked his right to remain silent. Id. at 7-9.

¶86 Like Goetsch, Smith told his interrogator that he had given all the information he had. Smith's statement——"I don't want to talk about this"——is identical to one of Goetsch's statements. Id. at 7. Thus, there is no basis for the different result in the present case.

¶87 The Supreme Court said that a defendant may invoke the right to cut off questioning by saying "that he want[s] to remain silent or that he [does] not want to talk with the police." See Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). When Smith said, "I don't want to talk about this," he unambiguously indicated that he did indeed not want to talk anymore.

¶88 For the foregoing reasons, I respectfully concur in part and dissent in part.

¶89 I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence/dissent.

3

¶90 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).*

**"I don't want to talk about it."** (Smith)

**"Take me to my cell."** (Cummings)

¶91 <u>Miranda</u> guides us in understanding a suspect's invocation during interrogation of the right to remain silent: "[I]f [a defendant] . . . indicates <u>in any manner</u> that he does not wish to be interrogated, the police may not question him."[1]

¶92 Recently, the United States Supreme Court adopted the <u>Davis</u>[2] objective "unequivocal invocation" test for gauging a defendant's invocation of the right to remain silent. <u>See</u> <u>Berghuis v. Thompkins</u>, 560 U.S. 370 (2010).

¶93 The defendants and the State agree that <u>Davis</u>/<u>Thompkins</u> governs the instant cases but express concern that the court of appeals has not followed these Supreme Court holdings.

¶94 Both defendant Cummings and the State agree, as do I, that under the <u>Davis</u> "unequivocal invocation" test, the determination of whether an invocation of a <u>Miranda</u> right is unequivocal uses an objective standard. Whether a defendant has unequivocally invoked a right is assessed by determining how a <u>reasonable</u> police officer would understand the suspect's

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 445 (1966) (emphasis added).

[2] <u>Davis v. United States</u>, 512 U.S. 452 (1994).

1

statement in the circumstances.[3] Defendant Cummings and the State agree that certain language in State v. Ross, 203 Wis. 2d 66, 552 N.W.2d 428 (Ct. App. 1996), referring to the suspect's subjective intent, is problematic under Davis/Thompkins.

¶95 The State explicitly asks the court to disavow language in Ross referring to the suspect's intent, language that has been cited in other court of appeals decisions. The State's request is framed as follows:

> The State agrees with Cummings that language in Ross referring to the suspect's subjective intent is problematic. As Cummings observes, the test in Davis (and Thompkins) is objective: whether a suspect has unequivocally invoked his or her rights under Miranda is "an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." Thompkins, 560 U.S. at 381-82 (quoting Davis, 512 U.S. at 458-59). To the extent that Ross suggests that courts and police must consider a suspect's subjective intent, as well as his or her statements and non-verbal cues, in determining whether an unequivocal invocation has been made, Ross is inconsistent with Davis and Thompkins. The State asks the court to address this issue in its opinion, and explicitly disavow language in Ross referring to the suspect's intent, which was also cited in [State v.] Markwardt, [2007 WI App 242,] 306 Wis. 2d 420, ¶28, [742 N.W.2d 546,] and [State v.]

---

[3] In addressing the unequivocal invocation test of whether a suspect seeks to invoke his or her right to counsel, the Court explained: "Although a suspect need not 'speak with the discrimination of an Oxford don,' . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459 (quoted source omitted).

Hampton, [2010 WI App 169,] 330 Wis. 2d 531, ¶46[, 793 N.W.2d 901].[4]

¶96 The majority opinion relies on Ross and Markwardt,[5] citing the cases frequently. The majority opinion does not, however, clarify Ross in the manner requested by both the State and Cummings.

¶97 The majority opinion, dwelling on the suspect's subjective motives, seems to apply a subjective "unequivocal invocation test," contrary to the holdings of the United States Supreme Court in Davis and Thompkins. I think federal district court Judge Griesbach got it right in Saeger v. Avila, 930 F. Supp. 2d 1009 (E.D. Wis. 2013), overturning an unpublished court of appeals decision.[6]

¶98 The federal court stated that the Wisconsin court of appeals "found that while Saeger's actual words were clear, he did not really mean them." The Saeger court concluded that "if this reasoning [of the court of appeals] were accepted, then it is difficult to imagine a situation where a suspect could meaningfully invoke the right to remain silent no matter what words he used." Saeger, 930 F. Supp. 2d at 1015-16.

¶99 Saeger correctly stands for the proposition that a court should look to the words the suspect uses in the context in which they were spoken, but that a court cannot manufacture

---

[4] Brief of Plaintiff-Respondent and Supplemental Appendix at 12-13.

[5] State v. Markwardt, 2007 WI App 242, 306 Wis. 2d 420, 742 N.W.2d 546.

[6] State v. Saeger, No. 2009AP133-CR, unpublished slip op. (Wis. Ct. App. Aug. 11, 2010). Saeger was a habeas case.

3

ambiguity "by examining a suspect's possible motive . . . ." Saeger, 930 F. Supp. 2d at 1019.

¶100 The majority opinion seems to assert that the defendants did not mean what they said.[7]

¶101 In addition to arguably employing the wrong test, the majority opinion finds equivocation where, in my opinion, none exists and ignores the plain meaning of the defendants' requests in both cases. The majority opinion's application of the "unequivocal invocation" test to the two instant cases, whether as a subjective or objective test, ignores the reality of colloquial speech.

¶102 In the end, I conclude that a reasonable person would understand that "I don't want to talk about this" and "take me to my cell" mean the conversation is at an end.

¶103 As the law currently stands, law enforcement officers are encouraged but not required to ask clarifying questions,[8] and courts are encouraged to resist creating ambiguity in straightforward statements. In both Smith and Cummings, had the officers viewed the statements at issue as unclear and asked

---

[7] Majority op., ¶¶54, 58-59, 62 (speculating that Cummings was "fencing" with his interrogator and that Smith was professing his innocence).

[8] Davis, 512 U.S. at 461 ("Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.")

4

clarifying questions, appellate review in the court of appeals and in this court might have been avoided.[9]

¶104 Although neither the State nor the defendants challenge the use of the Davis/Thompkins rule, I do.

¶105 I commented on the shortcomings of the "unequivocal invocation" test in my dissent in State v. Subdiaz-Osorio in the context of invoking one's Miranda right to counsel[10] and in my dissent in State v. Wantland in the context of withdrawal of consent to a search.[11] These comments apply to the present cases relating to invocation of a suspect's Miranda right to remain silent.

¶106 Because it is so difficult to find a clear, discernable, bright line between equivocal and unequivocal statements, courts employ "selective literalism," sometimes viewing a suspect's language as unequivocal, other times requiring very clear language.[12]

---

[9] The interrogating officer in Smith did not merely fail to ask clarifying questions; he erroneously stated, "I got a right to ask you about it," asserting his authority and undercutting the defendant's constitutional right to remain silent. Accord State v. Wantland, 2014 WI 58, ¶¶81-82, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting) (concluding that an officer cannot cut off a defendant's opportunity to refuse to give consent to a search by erroneously asserting legal authority).

[10] State v. Subdiaz-Osorio, 2014 WI 87, ¶¶___, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting).

[11] State v. Wantland, 2014 WI 58, ¶¶84-91, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting).

[12] Marcy Strauss, Understanding Davis v. United States, 40 Loyola L.A. L. Rev. 1011, 1062 (citing Peter M. Tiersma & Lawrence M. Solan, Cops and Robbers: Selective Literalism in American Criminal Law, 38 Law & Soc'y Rev. 229, 256 (2004)).

¶107 As I wrote in my dissents in <u>Subdiaz-Osorio</u> and <u>Wantland</u>, the "unequivocal invocation" test invites equivocation on the part of courts and has led to inconsistent, subjective results in the case law.

¶108 Inconsistencies are glaringly apparent in courts' use of the "unequivocal invocation" test in the context of the right to counsel. Comparing statements that have been deemed "unequivocal" by a court with those that have been deemed "equivocal" reveals an unsettling arbitrariness. For instance, one court deemed "Can I call my lawyer?" equivocal, whereas another deemed "Can I have my lawyer present when [I tell you my story]?" unequivocal.[13]

¶109 I agree with Justice Sotomayor's dissent in the recent 5-4 <u>Thompkins</u> decision, which comments on the weaknesses of the "unequivocal invocation" test in evaluating a suspect's statements as follows:

> The Court asserts in passing that treating ambiguous statements or acts as an invocation of the right to silence will only marginally serve <u>Miranda</u>'s goals. Experience suggests the contrary. In the 16 years since [<u>Davis v. United States</u>, 512 U.S. 452, 461 (1994)] was decided, ample evidence has accrued that criminal suspects often use equivocal or colloquial language in attempting to invoke their right to silence. A number of lower courts that have (erroneously, in my view) imposed a clear-statement requirement for invocation of the right to silence have rejected as ambiguous an array of statements whose meaning might otherwise be thought plain. At a

---

[13] <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001); <u>Taylor v. State</u>, 553 S.E.2d 598, 601-02 (Ga. 2001).

For a survey of statements that have and have not been deemed equivocal, see Strauss, <u>supra</u> note 12, at 1061-62.

6

minimum, these decisions suggest that differentiating "clear" from "ambiguous" statements is often a subjective inquiry.[14]

¶110 Because the majority opinion fails to uphold the broad protection mandated by Miranda and undermines the core principle of protecting the defendants' Fifth Amendment right against compelled self-incrimination, I dissent.

---

[14] Berghuis v. Thompkins, 560 U.S. 370, 410-11 (2010) (Sotomayor, J., dissenting) (internal quotation marks, citation, and footnote omitted).