**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 19, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP494-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CF5384

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

DEYONTAE CORNAIL STINSON,

      DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: FREDERICK C. ROSA, Judge. *Affirmed.*

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Deyontae Cornail Stinson appeals a judgment of conviction, following a jury trial, of five charges. Stinson also appeals the order denying his postconviction motion for relief.  We affirm.

## BACKGROUND

¶2     The following facts are taken from the criminal complaint. On December 9, 2015, Stinson was charged with one count of attempted armed robbery as a party to a crime, two counts of first-degree reckless injury, with the use of a dangerous weapon, and two counts of being a felon in possession of a firearm. All of the charges were issued with the habitual criminality penalty enhancer.  On August 14, 2015, Stinson and his brother, Lavontae, entered the Quik Pick Food Mart on 3332 West Lincoln Avenue, Milwaukee, with masks on. One of them pointed a gun at the cashier, S.A., while the other acted as the lookout.  Ultimately, the shooter shot S.A. in the arm and shot a customer, J.M., in the leg.  J.M. told police that prior to the attempted robbery, he saw a dark, four-door sedan circling his neighborhood.  J.M. did not recognize either the car or the occupants, prompting him to arm himself with his handgun and go to the food mart, where he was a regular customer.  J.M. told police that he heard the shooter demand money from S.A. and then shoot S.A.  J.M. also heard the lookout say, "Self, there's somebody in the aisle."  (Bolding and italics omitted.)  J.M. was shot shortly thereafter.

¶3     J.M described the shooter as a teenage black male with a caramel complexion, small in build, with hazel eyes, and wearing a self-made mask.  J.M. described the lookout as a teenage black male with a dark complexion and four-to–six-inch dreadlocks, weighing approximately 100 pounds and wearing a self-made mask.

¶4 Another witness told police that just prior to the robbery, she saw two men exit a vehicle and attempt to conceal their identities. One of the men matched J.M.'s description of Lavontae. She described the vehicle as a small, gray SUV.

¶5 During the course of the investigation into the robbery, Milwaukee Police discovered that other police officers were dispatched to 533 A North 26th Street, on August 8, 2015, in response to a shots fired complaint. Lavontae was one of the residents at that location. Another resident told police that Lavontae fired a gun into the air. Police recovered two .380 caliber casings from the scene. Police ultimately discovered that the casings recovered from Lavontae's residence matched the casings discovered at the scene of the Quik Pick Food Mart.

¶6 On September 9, 2015, Milwaukee Police conducted a traffic stop of a black and gray Buick Rendezvous matching the description of the vehicle used during the attempted robbery. Stinson was the driver and Lavontae was a rear passenger. They were asked to exit the vehicle after the officers detected the smell of marijuana. The officers discovered two unfired PPU[1] .380 caliber rounds and one unfired Winchester .380 caliber round—matching the same brand and caliber of the fired casings found at the Quik Pick Food Mart. A license plate check of the vehicle revealed that the vehicle belonged to Stinson's wife.

¶7 Stinson and Lavontae were brought to the Milwaukee Police Department for questioning following the traffic stop. The officers noted that the brothers matched the physical descriptions provided by J.M. and an additional

---

[1] PPU and Winchester are both brands of ammunition.

witness. During Stinson's interview, Lavontae walked by the interview room and referred to Stinson as "Self."

¶8     Police also obtained a warrant for Stinson's cell phone. Among the items discovered on the phone was a four minute video featuring Stinson smoking an apparent marijuana blunt, rapping, pulling out a .380 caliber Cobra handgun, talking about getting rich, and then panning to Lavontae who says, "In a week or two, we're going to be rich, man." The video was filmed one week before the robbery.

¶9     The cell phone also revealed that in the twenty-four hours that followed the robbery, Stinson used his phone to look up news stories about the robbery.

**The Trial**

¶10     The matter proceeded to trial where the State called sixteen witnesses, played recorded statements made by Stinson to police, presented surveillance videos of the attempted robbery and shootings, and presented the evidence obtained from Stinson's cell phone.

¶11     As relevant to this appeal, the trial court held a ***Miranda/Goodchild***[2] hearing to evaluate the admissibility of the recorded statements Stinson made to police on September 10, 2015, the day after the traffic stop, and on January 6, 2016, after he was rearrested. Trial counsel argued that Stinson's statements were involuntary because he was intoxicated. Both officers who interviewed Stinson on

---

[2] *See **Miranda v. Arizona**,* 384 U.S. 436 (1966); ***State ex rel. Goodchild v. Burke***, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

those days testified that Stinson was coherent, alert, and cooperative during his interviews. The trial court found the statements were made voluntarily.

¶12    Multiple witnesses testified at trial consistent with the facts laid out in the criminal complaint. Detective Daniel Wilcox testified that he obtained video footage from the Quik Pick Food Mart attempted robbery. The jury was shown multiple videos from multiple angles, which Wilcox described as they were shown to the jury. As relevant to this appeal, the videos showed two men entering the food mart and one of the men shooting S.A. Another video cuts to J.M. after he is shot. The videos also show the suspects fleeing the food mart.

¶13    Both S.A. and J.M. testified consistent with their statements in the criminal complaint. S.A. testified that the shooter was shorter than him and that he (S.A.) stands at 5'8". J.M. testified that: the robbers wore masks made from t-shirts; the shooter was "short"; the shooter had a medium or caramel complexion and hazel eyes; and that the lookout said "Self, he's got a gun," after J.M. pulled out his gun.

¶14    The State introduced evidence of Stinson's and Lavontae's physical appearances in order to identify Stinson as the shooter and Lavontae as the lookout. Police testified that though Stinson refused to let them measure his height, they believed he is 5'4" based on prior interactions, and that Stinson has hazel eyes. Lavontae is 5'7" to 5'8". J.M. and S.A. both are 5'8".

¶15    The State also introduced evidence of Stinson's vehicle. A resident from the Quik Pick Food Mart neighborhood testified that shortly before the attempted robbery and shooting, she noticed a dark car parked outside of her garage. She stated that two men exited the car, put hoods on, and then reentered the vehicle and left. She stated when she went outside later in the day, she noticed

an ambulance and a large gathering. When police showed her a picture of the vehicle suspected to be used by the suspects, the resident recognized the vehicle as the one parked outside of her home earlier in the afternoon. The resident also identified a photo of the vehicle—a black and gray Buick Rendezvous—for the jury. The jury also watched a surveillance video from outside of the resident's home, which showed a black Buick Rendezvous with a "silver or gray" bumper, driving in the area around the time of the attempted robbery and shooting.

¶16 Milwaukee Police Officers testified that the vehicle was stopped twice after the robbery—once on August 17, 2015 and once on September 9, 2015. Stinson was in the vehicle both times. The first time the vehicle was stopped, the vehicle had temporary license plates that were registered to the "Goodnetter Auto Sales Company." The second time the vehicle was stopped, the vehicle had a different "dealer advertisement" instead of a rear license plate. Officer Aaron Frantal testified that he conducted the September 9, 2015 stop. Stinson, Lavontae, Stinson's wife, and another male were all in the car. He testified that in the driver's side door, police found three .380 caliber rounds; one was Winchester brand, the other two were PPU brand—the same caliber and brands as the casings found at the food mart.

¶17 Milwaukee Police Officer Michael Zimmerman testified that he interviewed Stinson following the September traffic stop. Zimmerman explained that Stinson denied involvement in the robbery during his September 10, 2015 interview; however, when Lavontae walked past the interview room, Lavontae said, "something like, 'Hey Self, what's up, Self?'"; Stinson responded by also calling Lavontae "Self." The jury watched that portion of the interview video.

¶18 The jury also watched the video obtained from Stinson's cell phone in which Stinson spoke to the camera while holding a .380 caliber firearm. Milwaukee Police Officer Dean Newport testified that he reviewed the video—filmed one week before the shooting—and that based on his experience with the police department and the federal Alcohol, Tobacco and Firearms Bureau, he was able to decipher some of the language Stinson used in the video. Newport translated portions of the video, explaining that Stinson was talking about "shooting" or "robbing"; that Stinson talked about "caus[ing] fear to the recipient of the [firearm] aiming"; that Stinson made reference to killing by shooting someone through the eye; and that Stinson pointed the gun at the camera and talked about getting rich. Newport also stated that when the camera panned to Lavontae, he (Lavontae) stated that the brothers would be rich in "a week or two," and made reference to a robbery. Newport testified that search records of Stinson's phone show searches for a .380 caliber firearm. Newport also testified that search records show that Stinson looked up news articles about the attempted robbery after the fact. Trial counsel asked that portions of the January 6, 2016 interview be shown to the jury because in that video Stinson claims that he is a rapper and that he filmed the video for entertainment. That portion of the video was also shown to the jury.

¶19 Xai Xiong, a firearms and tool marks examiner, testified that based on the tool marks, the three casings found at the Quik Pick Food Mart and the two casings found at Lavontae's home after the August 8, 2015 shooting, were fired from the same .380 caliber firearm. Xiong admitted that he did not analyze the actual firearm, but stated that he could still analyze the casings. Xiong testified that tool marks left by a firearm are similar to fingerprints. He also testified that a second firearms examiner confirmed his findings.

¶20     The jury found Stinson guilty as charged.  The trial court imposed a fifty-three year sentence.

**Postconviction Motion**

¶21     Stinson filed a postconviction motion for relief, arguing, as relevant to this appeal, that trial counsel was ineffective in numerous ways.  Specifically, Stinson argued that counsel was ineffective for failing to:  (1) move to sever the felon in possession charge that was based on Stinson's cell phone video; (2) move to exclude the cell phone video; (3) object to Xiong's testimony that tool marks are similar to fingerprints; (4) object to Newport's translation of terms used in Stinson's cell phone video; (5) object to Zimmerman's testimony about the August 17, 2015 traffic stop; (6) object to Xiong's testimony that a second analyst confirmed his findings; and (7) object to the admission of Stinson's January 6, 2016 statements to police on the grounds that Stinson invoked his right to counsel and exercised his right to remain silent.  Stinson also argued that trial counsel's deficiencies resulted in cumulative prejudice.

¶22     The postconviction court denied Stinson's motion without a hearing, finding, primarily, that Stinson could not demonstrate prejudice.  This appeal follows. Additional facts will be included as necessary to the discussion.

## DISCUSSION

¶23     On appeal, Stinson argues that he was entitled to a ***Machner***[3] hearing because his postconviction motion alleged sufficient factual allegations

---

[3] *See **State v. Machner**,* 92 Wis.2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

that trial counsel was ineffective for failing to: (1) sever the felon in possession charge that stemmed from Stinson's cell phone video; (2) move to exclude the video in its entirety; (3) object to Xiong's testimony about ballistics testing; (4) object to Newport's testimony translating the slang Stinson spoke in his video; (5) object to testimony about the August 17, 2015 traffic stop; (6) object to Xiong's testimony about a second firearms test; and (7) object to the admission of Stinson's January 2016 statements to police. Stinson also argues that the cumulative effect of counsel's deficiencies resulted in cumulative prejudice. We address each issue.

**Standard of Review**

¶24   To prevail on an ineffective assistance of counsel claim, a defendant must prove both that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See **Strickland v. Washington***, 466 U.S. 668, 687 (1984). If the defendant fails to prove one component, a court need not consider the other. *See **id.*** at 697. To prove deficiency, Stinson must show that trial counsel's actions or omissions were "professionally unreasonable." *See **id.*** at 691. To prove prejudice, Stinson must show that trial counsel's errors had an actual, adverse effect on his defense. *See **id.*** at 693. Whether counsel's performance was deficient and whether the deficiency was prejudicial are questions of law that we review *de novo*. *See **State v. Johnson***, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶25   A defendant claiming ineffective assistance of trial counsel must seek to preserve trial counsel's testimony in a postconviction hearing. *See **State v. Machner***, 92 Wis.2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). Nonetheless, a defendant is not automatically entitled to a hearing on the claim. A postconviction

court must grant a hearing only if the motion contains allegations of material fact that, if true, would entitle the defendant to relief. *See* ***State v. Allen***, 2004 WI 106, ¶¶9, 13, 274 Wis. 2d 568, 682 N.W.2d 433. Whether the motion contains sufficient allegations of material fact to earn a hearing presents an additional question of law for our independent review. *See* ***id.***, ¶9. To be sufficient, the motion should "allege the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *See* ***id.***, ¶23. If the defendant does not allege sufficient material facts that, if true, would entitle him or her to relief, if the allegations are merely conclusory, or if the record conclusively shows that the defendant is not entitled to relief, the postconviction court has discretion to deny a motion without a hearing. *See* ***id.***, ¶9. We review the postconviction court's discretionary decisions with deference. *See* ***id.***

¶26 Stinson alleges seven issues of ineffective assistance of counsel. In a thorough, well-reasoned written decision, the postconviction court rejected all of Stinson's claims, finding that Stinson's factual allegations did not prove prejudice. We agree. Because some of Stinson's arguments are interrelated, we address the related arguments jointly and in a slightly different order from Stinson's brief to this court.

### A. Felon in Possession and Cell Phone Video

¶27 Stinson contends that trial counsel was ineffective for failing to move to sever the felon in possession charge that stemmed from the August 7, 2015 video recorded on Stinson's cell phone. Specifically, Stinson contends that the charge is not connected to charges relating to the armed robbery and was unfairly prejudicial. We agree with the postconviction court that Stinson has not demonstrated he was prejudiced by counsel's failure to seek severance of the

felon-in-possession charge. First, in arguing that trial counsel was ineffective for having failed to seek severance, Stinson must show that it is reasonably probable that severance would have resulted in his acquittal. *See State v. Moats*, 156 Wis. 2d 74, 101, 457 N.W.2d 299 (1990). Given the overwhelming evidence that Stinson was involved in the food mart robbery, we conclude that it is highly unlikely the jury would have acquitted Stinson of any of the charges had the felon in possession charge been severed. Second, we agree with the postconviction court that the video of Stinson brandishing a firearm was "not so disassociated from the robbery and shooting not to have relevance." The video, in which Stinson declares that he will be rich soon, was filmed one week before the robbery. Stinson makes reference to robberies and shootings, and is flashing a gun of the same caliber used in the robbery. In light of these facts, the postconviction court found that any prejudicial components of the video did not outweigh its relevance. The court stated that it would not have granted a motion to sever had trial counsel filed a motion. Accordingly, trial counsel cannot be found ineffective. *See State v. Simpson*, 185 Wis. 2d 772, 784, 519 N.W.2d 662 (Ct. App. 1994) (stating that if the motion would have been unsuccessful, there can be no prejudice and the claim of ineffective assistance of counsel fails).

### B. Newport's Testimony

¶28 Along the same lines, Stinson argues that trial counsel was ineffective for failing to object to Newport's testimony effectively translating Stinson's slang in the cell phone video. Stinson argues that Newport was not

11

named as an expert witness and that he did not meet the requirements set forth by WIS. STAT. § 907.01(2017-18)[4] to testify as a lay witness.

¶29    The postconviction court found that if trial counsel had objected to Newport's testimony, it would have overruled the objection. The court noted that based on Newport's training and experience, his testimony was helpful to the jury. Accordingly, trial counsel cannot be found ineffective. *See Simpson*, 185 Wis. 2d at 784.

### C.    Xiong's testimony about ballistics testing and a Second Firearms Test

¶30    Stinson contends that trial counsel was ineffective for failing to object to Xiong's ballistics testimony comparing tool markings to a fingerprint. Stinson argues that the testimony was not supported by any experimental or statistical data and that counsel should have objected to the testimony for its lack of scientific certainty. We note first that Stinson's argument is conclusory. Stinson relies on pre-2010 journal articles suggesting that insufficient data existed to support the foundational validity of "absolute" conclusions in the area of ballistics testing. Stinson does not explain how information from these journals could have been used to undermine Xiong's testimony. Moreover, Stinson cannot demonstrate prejudice. Even without Xiong's testimony, the jury still heard testimony about a .380 caliber firearm being used to commit the robbery, casings from a .380 caliber firearm found in Stinson's vehicle, and casings from a .380 caliber firearm found at Lavontae's home. The jury also saw Stinson brandishing

---

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

a .380 caliber firearm in the video obtained from his cell phone. A reasonable jury could conclude that the same firearm was used in most or all of the incidents described. For the same reasons, we conclude that Stinson cannot demonstrate prejudice regarding Xiong's testimony about a second firearms test. Even if counsel had objected to the testimony, the objection would not have undermined the litany of evidence tying Stinson to the firearm used at the food mart and the firearm depicted in the video. We agree with the postconviction court that objections to Xiong's testimony would not have altered the outcome of the trial.

### D.    August 17, 2015 Traffic Stop

¶31     Stinson next contends that trial counsel was ineffective for failing to object to Zimmerman's testimony about the August 17, 2015 traffic stop. Zimmerman testified that he did not conduct the stop himself, but that during the course of his investigation into the food mart incident, he learned that Milwaukee Police stopped a dark Buick Rendezvous on August 17, 2015, in connection with the incident. Zimmerman testified that Stinson was in the vehicle and that the license plate of the vehicle was different from when the same vehicle was stopped the following month. The State claimed that this was significant evidence, as it was suspicious behavior post-shooting, which suggested consciousness of guilt. The State also argued that the license plate during this stop was the same license plate seen in the surveillance videos from the robbery.

¶32     We conclude that Stinson cannot demonstrate prejudice. Even without Zimmerman's testimony, ample evidence in the record supports Stinson's conviction. The surveillance videos, the physical description of the actors, the type of gun used in the incident, the cell phone video, and the witnesses description of the vehicle used for the incident, all support the jury's verdicts.

**E.      Stinson's January 2016 statement to police**

¶33     Stinson contends that counsel was ineffective for failing to object to the admission of Stinson's January 2016 statements to police.

¶34     In September 2015, Zimmerman interviewed Stinson while Stinson was in custody following a traffic stop of the vehicle matching the description of the vehicle used in the food mart incident.  Zimmerman read Stinson his rights and Stinson initially agreed to speak with Zimmerman.  However, Stinson repeatedly asked to be returned to his cell and denied his involvement.  Zimmerman did not return Stinson to his cell and told Stinson that while Stinson had the right not to speak, he still had to listen to Zimmerman speak.  Stinson said he needed a lawyer present and Zimmerman responded, "sure," and, "that's where you're going to sit then."

¶35     Zimmerman and Newport both interviewed Stinson in January 2016. Stinson was read his rights.   During that interview, Stinson made several inculpatory statements, which were described to the jury.  Stinson argues that he invoked his right to counsel after police asked whether he'd like to make a statement based on the following response:

> No, I needed to, I want to see my public defender … I've been saying here for the last couple of months of this shit like this don't make sense what they got on me and none of this shit be ... If you gonna arrest somebody why would you let them go the first time, even with the evidence?  Does that make sense?

¶36     The parties dispute what Stinson says after "I want to see my public defender," but it is undisputed that Newport then asked:  "Do you have a lawyer right now?"; Stinson answered, "No, I don't have a lawyer right now."  Newport

then said: "So, yeah I don't know what your position is, but if you're asking me questions, I'll answer your questions all day long. If you're asking me a question—"; Stinson interjected: "I'm saying does that make sense though, that they're going to let you go? Okay, okay I can see you're working on it . . . ." Newport asked if Stinson was willing to answer questions or ask questions he wanted answered; Stinson said, "yeah," and stated that if he did not want to answer, he would "plead the Fifth." He confirmed he understood his rights. After Zimmerman entered the room Newport explained that he asked Stinson, "well do you want a lawyer or don't you want a lawyer," but Stinson understood that if he did not want to answer questions, he did not have to answer any questions, and that if he wanted to go to his cell, they would take him to his cell. Zimmerman reiterated to Stinson that he could choose what questions he wanted to answer; Stinson again acknowledged he could "plead the Fifth," which Newport confirmed. The interview continued without Stinson mentioning a right to counsel.

¶37 Stinson argues that (1) he invoked his right to counsel during the January 2016 interview, and (2) that the September 10, 2015 interview was illegally conducted based on Stinson's contention that he invoked his right to remain silent, thus rendering the January 6, 2016 interview inadmissible. We disagree.

¶38 Invocation of the right to counsel and the right to remain silent must be unambiguous and unequivocal. *See State v. Cummings*, 2014 WI 88, ¶¶50-51, 357 Wis. 2d 1, 850 N.W.2d 915. Whether an individual has adequately invoked either right is a question of constitutional fact. *Id.*, ¶43. We uphold the trial court's findings of historical fact unless clearly erroneous, then independently apply constitutional principles to those facts. *See id.*, ¶¶43-44 (right to remain

15

silent); ***State v. Edler***, 2013 WI 73, ¶20, 350 Wis. 2d 1, 833 N.W.2d 564 (right to counsel).

¶39 At the January 2016 interview, Stinson's statement that he wanted to see his "public defender" was followed by language that the parties dispute. Stinson then stated that he did not actually have a public defender, he questioned whether the officers had evidence, and then agreed to questioning while acknowledging that he could "plead the Fifth" if he did not want to answer questions. The officers also confirmed with Stinson that he understood his rights. The record supports the postconviction court's finding that Stinson's statements at the January 2016 interview were voluntary.

¶40 As to whether the statements were improperly attenuated from the September 2015 interview, we conclude that Stinson is again mistaken. Stinson's argument is based upon his contention that Zimmerman, who was present in both interviews, knew in January 2016, based upon the September 2015 interview, that Stinson wished to remain silent and wished to exercise his right to counsel, but that Zimmerman ignored his requests. The record does not support his arguments. Stinson repeatedly asked to be returned to his cell and repeatedly denied involvement in the robbery attempt, but told Zimmerman to come talk to him when they had more evidence. When Stinson mentioned a public defender in the second interview but kept asking questions, Newport verified that Stinson wanted to keep talking; Newport and Zimmerman again verified that a second time. The postconviction court found, based on the ***Miranda/Goodchild*** hearing record, that Stinson's January 2016 statements were voluntary and not tainted. The court also stated that had trial counsel attempted to suppress the statements, it would have denied the motion. Accordingly, trial counsel cannot be found ineffective. *See* ***Simpson***, 185 Wis. 2d at 784.

¶41     We conclude that counsel was not ineffective. Accordingly, we conclude that the cumulative effect of Stinson's allegations did not prejudice his trial. For the foregoing reasons, we affirm the judgment and order.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.