COURT OF APPEALS
DECISION
DATED AND FILED

February 11, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP997-CR**

Cir. Ct. No. 2018CF1252

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

MARKEITH J. WILSON,

  DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: JASON A. ROSSELL, Judge. *Affirmed*.

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Markeith J. Wilson appeals from a trial court judgment entered on jury verdicts convicting him of first-degree intentional

homicide and three other serious felonies, as party to a crime (PTAC). Wilson also appeals from an order denying his motion for postconviction relief following an evidentiary hearing. He seeks a new trial based on alleged errors in the jury instructions, voir dire, and the State's closing argument. In the alternative, Wilson seeks resentencing based on his assertion that the court erroneously exercised its discretion in sentencing him to life imprisonment without the possibility of extended supervision. We reject Wilson's arguments. Accordingly, we affirm the judgment and the order.

## BACKGROUND

¶2 The parties do not generally dispute the facts pertinent to this appeal. The State charged Wilson with first-degree intentional homicide following the death of Joseph Riley. Wilson also was charged with the attempted first-degree intentional homicide of Riley's friend, Emily, as well as conspiracy to commit armed robbery and armed burglary.[1] All four counts charged Wilson as PTAC.

¶3 The charges stemmed from an armed robbery gone wrong. Wilson and his codefendants conspired to steal money and marijuana from Riley's home, using firearms to achieve their goal. Riley had been suggested as an easy robbery target by Christina May, the mother of one of Riley's friends, though May did warn the would-be robbers that Riley recently had been robbed by someone else and subsequently had purchased a gun. The first plan involving Riley was for May to go buy marijuana from him and leave the door open for the others to come

---

[1] Although we identify the homicide victim, Joseph Riley, we follow the parties' lead and use the pseudonym "Emily" to refer to the victim of the attempted homicide. *See* WIS. STAT. RULE 809.86 (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

in with guns and commit the robbery; that plan was abandoned when Riley told May on the day it was to be carried out that he had company over so he was not available to sell marijuana that day. Later that same night, Wilson and his codefendants came up with a new plan to rob Riley. They went to his house planning to enter through the front door to steal any marijuana and money they could find. They knocked on the door, but Riley refused to open it. Because they were unable to get into Riley's house that night, Wilson and the others left.

¶4 Despite two failed plans, Wilson and the others conspired to rob Riley once again—only one night after the failed attempt—this time by kicking the door in. The only other difference besides the plan to break down the door was that one of the individuals who had carried out the failed attempt the night before did not go with Wilson and the others on the next night. Instead, a man named Demarco Hudson, one of Wilson's eventual codefendants, joined the criminal enterprise.

¶5 Codefendant Anthony Harris II told police that he, Wilson, and Hudson approached Riley's home the night after their failed robbery attempt. They kicked the front door in. Wilson then entered the home, pointed his gun into the front room, and asked, "Where's the shit at?" As May had warned, Riley also was armed. He reportedly shot toward the door, hitting Wilson and Hudson. Upon kicking in the door, Harris reportedly fired aimlessly until he ran out of bullets, shooting Riley four times and Emily nine times.

¶6 A third person at Riley's home that night went into the kitchen and called 911 when he heard the front door being kicked in, while a fourth person hid in a bedroom. Police on scene discovered Riley, who succumbed to the injuries

caused by his gunshot wounds, and Emily, who was severely injured, surrounded by spent bullet casings.

¶7 None of the would-be robbers were still on scene when police arrived. Wilson, Harris, and Hudson had fled back to the car after the incident, and another eventual codefendant, Augustine Sanchez, drove them around searching for a hospital because Wilson and Hudson had been shot. Unable to find a hospital, Sanchez and Harris left Wilson and Hudson at a gas station. Harris then called 911 to report that his "brothers" had been shot at a party. Wilson and Hudson were subsequently transported to a hospital and treated for their injuries.

¶8 Police interviewed Wilson at the hospital. He provided several different accounts of the events, but ultimately admitted that he and Hudson went armed with loaded firearms to Riley's house, kicked the door down, and engaged in a shootout with the homeowner. Detectives later learned about Sanchez's and Harris' involvement in the incident from Wilson's jail phone calls.

¶9 Wilson was the first of the codefendants to have a jury trial. The State presented evidence against Wilson including testimony from the first law enforcement officers to arrive on scene, testimony from Emily and the other occupants of the home that night, and from Wilson's codefendants. Wilson's trial counsel argued that Harris emptying his weapon after Wilson and Hudson scrambled back out the door was not a natural and probable consequence of this robbery but was Harris "going rogue." At most, counsel argued, Wilson's actions amounted to felony murder. Counsel stated that Wilson "joined that armed robbery without any intentions or expectations of using that firearm." Following deliberations, the jury found Wilson guilty of all four counts as charged.

¶10 At sentencing, the State argued for life in prison without the possibility of extended supervision. Wilson requested eligibility for release on extended supervision, presenting the trial court with character letters and supportive statements from members of the community. The court sentenced Wilson to life without the possibility of extended supervision for his role in Riley's death and 20 years of initial confinement and 10 years of extended supervision for his role in causing Emily's injuries. The court ordered those sentences to run consecutively. The court also imposed nine years of initial confinement and seven years of extended supervision for conspiracy to commit armed robbery, and four years of initial confinement and three years of extended supervision for armed burglary, with the sentences on the two lesser counts ordered concurrent to each other and to the other sentences.

¶11 Wilson filed a motion for postconviction relief. He argued that trial counsel was ineffective for failing to object to certain jury instructions and portions of the prosecutor's closing argument. He also contended the trial court erroneously exercised its discretion in making him ineligible for extended supervision and that his sentence was unduly harsh and excessive.

¶12 The trial court denied Wilson's motion following a two-day evidentiary hearing. The court found that the State had not said anything improper during its closing argument and, therefore, trial counsel could not have been ineffective in failing to object. Additionally, it found that it sentenced Wilson based on the proper factors, and that the sentence was not unduly harsh or excessive given Wilson's role in the homicide.

¶13 Finally, while acknowledging that it should have provided the jury with Wis JI—Criminal 411 instead of Wis JI—Criminal 406, the trial court

found the error harmless. The court determined that the jury would have found that the intentional homicide of Riley and attempted intentional homicide of Emily were committed "in pursuance of" the armed robbery had the court provided correct instruction. Since the error in the instruction was harmless, Wilson could not show prejudice from counsel's failure to object to the instructions and, thus, could not demonstrate that a new trial is warranted. Wilson appeals.

¶14     We include additional facts below as necessary to our analysis.

## DISCUSSION

¶15     Wilson raises the same issues on appeal as he did in his postconviction motion.[2] To be specific, Wilson again argues that he is entitled to a new trial based on errors in the jury instructions and/or improper remarks during trial by the prosecutor. In the alternative, he asks this court to vacate his life sentence and order resentencing. We address each of his arguments in turn below.

### I.     Errors in the jury instructions

¶16     On appeal, Wilson first argues the jury instructions given for the intentional homicide and attempted intentional homicide charges excluded "necessary language" for the jury to be properly instructed on those offenses. To explain, because WIS JI—CRIMINAL 406 was used instead of WIS JI—

---

[2] We decline the State's invitation to affirm this appeal based solely on the fact that Wilson's brief to this court is nearly identical to his postconviction motion, without presenting the proper standards of review and developing his arguments within the appropriate appellate framework. We agree that there are briefing shortcomings and caution counsel going forward that all arguments to this court must be presented and fully developed under correct legal standards, including this court's standard of review. We nonetheless address Wilson's arguments on their merits due to the serious nature of the convictions from which he appeals.

CRIMINAL 411, the jury was not instructed that to find Wilson guilty of the homicide, the State must prove that it "was committed in pursuance of" the armed robbery.

¶17    Wilson contends this error in the instructions entitles him to a new trial.   Trial counsel never objected to the jury instructions, however, which amounts to "waiver of any error in the proposed instructions[.]"   WIS. STAT. §§ 805.13(3), 972.11(1).   This court does not review unobjected-to errors in the jury instructions outside of the interests of justice or ineffective assistance of counsel frameworks.  *See* **State v. Schumacher**, 144 Wis. 2d 388, 407-08 n.14, 424 N.W.2d 672 (1988).   Though making no interests-of-justice argument, Wilson argues that his trial counsel was ineffective in failing to object to the improper jury instruction, but he fails to analyze the facts here in light of the correct framework, which we now set forth briefly.[3]

¶18    To establish a claim of ineffective assistance of counsel, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance.  **State v. Sholar**, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89.   We will not set aside the trial court's factual findings about what actions counsel took or the reasons for them unless those findings are clearly erroneous.  **State v. Balliette**, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334.   However, whether counsel's conduct violated the constitutional standard for effective assistance is ultimately a legal determination

---

[3] Because forfeiture is a doctrine of judicial administration, we retain the authority to address an issue on appeal even if it has not been properly preserved.  *See* **State v. Counihan**, 2020 WI 12, ¶27, 390 Wis. 2d 172, 938 N.W.2d 530.  We generally review alleged unobjected-to errors within the framework of ineffective assistance of counsel.  *Id.*, ¶28.

this court decides de novo. *State v. Swinson*, 2003 WI App 45, ¶57, 261 Wis. 2d 633, 660 N.W.2d 12. We need not address both elements of an ineffective assistance claim if the defendant fails to make a sufficient showing on one of them. *Id.*, ¶58.

¶19 After the close of evidence, the trial court provided the following instruction to the jury at trial:

> [T]he State must prove by evidence which satisfies you beyond a reasonable doubt that the defendant intentionally conspired with another to commit the crime of armed robbery, that first[-]degree intentional homicide was committed, and that under the circumstances first[-]degree intentional homicide was a natural and probable consequence of armed robbery.

The court then set out the elements of conspiracy, armed robbery, and first-degree intentional homicide, instructed the jury to "[f]inally, consider whether under the circumstances first[-]degree intentional homicide was a natural and probable consequence of conspiracy to commit armed robbery[,]" and explained circumstances under which a crime may be a natural and probable consequence of another crime. It followed the same pattern for the attempted homicide charge.

¶20 The trial court also instructed the jury on felony murder, stating the two following elements must be met: "First, the defendant was party to the crime of conspiracy to commit armed robbery. Secondly, the death of Joseph W. Riley was caused by the commission of the conspiracy to commit armed robbery." It then reinstructed the jurors on the elements of conspiracy and armed robbery, along with the definition of "cause[d] the death," meaning that commission of the felony was a substantial factor in bringing about the death.

¶21   As in his postconviction motion, Wilson argues on appeal that trial counsel was ineffective for failing to object to the trial court's use of WIS JI—CRIMINAL 406 instead of WIS JI—CRIMINAL 411. We assume, without deciding, that counsel was deficient for failing to request the proper jury instruction. However, as we now explain, we conclude that the court did not err in determining that Wilson cannot show prejudice resulting from this error.

¶22   A defendant proves prejudice by demonstrating there is a reasonable probability that, but for his or her counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The "reasonable probability" standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant. *Sholar*, 381 Wis. 2d 560, ¶44 (citation omitted). Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*, ¶45; *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). Thus, there is no reasonable probability of a different result based on alleged errors in a criminal trial when the conviction was otherwise supported by overwhelming evidence. *Sholar*, 381 Wis. 2d 560, ¶58.

¶23   The evidence from multiple witnesses who testified at Wilson's trial showed that Wilson kicked down Riley's door and that he and Harris rushed in pointing their guns, with Wilson in a shooting stance yelling "Where's the shit at?" Gunshots immediately began coming from all directions. Emily told the jury that it all happened so quickly, it felt "like it took a second." Codefendant Sanchez agreed with defense counsel on cross-examination that the gunshots were "instantaneous" upon the kicking in of Riley's door.

¶24 We conclude, as did the trial court after the postconviction hearing, that the evidence at trial showed the homicide and attempted homicide occurred because Wilson and the others were trying to "carr[y] out or pu[t] into effect" the armed robbery—the gunfire began immediately as they entered, the whole episode lasted somewhere between 15 and 30 seconds. *See* WIS JI—CRIMINAL 411 n.10. There was no evidence presented that would allow the jury to find that the homicide "was a second volitional act" separate and apart from the attempt at armed robbery. The same holds true for the attempted homicide of Emily. Providing the correct jury instruction would not have changed the jury's determinations of guilt.

¶25 In sum, it was entirely predictable to Wilson and his codefendants that someone would likely be shot and killed if they kicked down the door of a man they knew to be armed and, brandishing guns, burst into his home. The codefendants knew Riley had recently been robbed and had purchased a firearm to protect himself against precisely this scenario, making his homicide a "natural and probable consequence" of the attempted armed robbery. These shootings happened because Wilson and his coconspirators were in pursuance of the armed robbery, and things happened precisely as one would anticipate when several armed men attempt to rob an armed man in his home. On this record, therefore, Wilson fails to establish that he would have been acquitted had the jury been explicitly instructed that the homicide and attempted homicide must have been committed "in pursuance of the armed robbery." In other words, the trial court correctly decided the "likelihood of a different result" had the jury been instructed using WIS JI—CRIMINAL 411 was not "substantial[.]" *See **Sholar***, 381 Wis. 2d 560, ¶45.

II.   *Ineffective assistance for failure to object to prosecutor's statements*

¶26    Wilson next argues he is entitled to a new trial because the prosecutor violated his due process rights. He specifically challenges purported "misstatements" of the law that the prosecutor made when remarking on the kinds of cases the State believed warrant a felony murder conviction rather than a conviction for intentional homicide.

¶27    During closing argument (and, to some extent, voir dire), the State explained that the type of scenarios that would warrant a felony murder conviction rather than an intentional homicide conviction were those where the murder was not a natural and likely outcome of the defendant's actions, but rather something unexpected that nevertheless occurred only because the felony was being committed. Trial counsel did not object to the prosecutor's remarks, as Wilson concedes. Instead, counsel countered it with his own take during defense closing argument, explaining why felony murder "made so much more sense" on the facts presented here by distinguishing the State's examples. Because Wilson neither objected at trial to the prosecutor's comments nor moved for a mistrial, he forfeited these challenges. *See **State v. Saunders***, 2011 WI App 156, ¶29 & n.5, 338 Wis. 2d 160, 807 N.W.2d 679. As discussed in the previous section, however, we may address forfeited challenges on appeal if they are framed within the ineffective assistance of counsel rubric. *See **Schumacher***, 144 Wis. 2d at 408 n.14.

¶28    According to Wilson, the prosecutor so misstated the law and misled the jury that trial counsel's failures to object constituted ineffective assistance of

11

counsel.[4] However, Wilson again fails to address counsel's performance within the ***Strickland*** framework, instead baldly asserting that "the real controversy was never fully tried" due to the prosecutor's alleged "misconduct," and, as such, Wilson is entitled to a new trial. Wilson misses the mark, as we now explain, because counsel's failure to object to the remarks at trial places our review in the ineffective assistance realm, which Wilson fails to establish.

¶29 "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." ***Strickland***, 466 U.S. at 689. Reasonable strategic choices informed by counsel's investigation of the law and facts are virtually unchallengeable on appeal. ***Id.*** at 690. Counsel also does not perform deficiently by failing to bring a meritless motion. ***State v. Sanders***, 2018 WI 51, ¶¶29, 54, 381 Wis. 2d 522, 912 N.W.2d 16.

¶30 To that end, trial counsel testified at the postconviction evidentiary hearing that the decision to object or not to object is made "on the spot ... with a notion of where we are in the trial." He explained that during closing argument "there's a little more freedom of movement if you were – freedom of dialogue, because what we're talking about is argument. Arguments aren't evidence." Counsel further explained that "[a]rguments are the parties trying to capture the facts, capture law, trying to make sense of it to the jury[,]" and objecting during

---

[4] We note that as to trial counsel's failure to object, Wilson again fails to address either prong of the ineffective assistance of counsel analysis in a nonconclusory manner, offering a single paragraph on the issue and remaining silent on trial counsel's postconviction testimony. We nonetheless address this argument on its merits as well, again due to the nature of Wilson's convictions.

argument tends to highlight unfavorable facts to the jury. Finally, counsel summed it up as follows: "I don't want the jury to make it look like I'm trying to control what the State's saying. I just want to have the better argument." He believed he effectively addressed the prosecutor's argument in closing and did not wish to highlight the State's position to the jury by objecting.

¶31 After the evidentiary hearing on Wilson's postconviction motion, the trial court concluded trial counsel had not been ineffective because his failure to object was the result of a reasonable strategic decision and did not constitute deficient performance. It determined there was nothing improper about the prosecutor's closing argument, which was plainly attempting to explain what it means for first-degree intentional homicide to be a natural and probable consequence of a separate crime rather than a pre-planned killing. Our review of the record supports the court's determination.

¶32 We agree that trial counsel did not provide ineffective assistance in failing to object to the challenged remarks by the prosecutor in voir dire and closing arguments. Counsel's failure to raise an objection was not deficient, because counsel provided a reasonable explanation for why he viewed the testimony as nonprejudicial, and, accordingly, not worth an objection. Counsel's strategic decision not to object did not constitute deficient performance. *See **id.***

III. *Life imprisonment without the possibility of extended supervision*

¶33 Wilson finally argues that, in the event he fails to persuade this court that he is entitled to a new trial, we should remand to the trial court for resentencing. He claims the court erroneously exercised its discretion in imposing life imprisonment without the possibility for release on extended supervision for the first-degree intentional homicide of Riley. Wilson further contends his

sentence was unduly harsh and excessive, particularly when considering the sentences of his codefendants. After reviewing the record, including the court's sentencing remarks, we disagree.

¶34 It is well established that sentencing is within the trial court's discretion. *See State v. Gallion*, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. "A trial court misuses its discretion when it fails to state the relevant and material factors that influenced its decision, relies on immaterial factors, or gives too much weight to one factor in the face of other contravening factors." *State v. Steele*, 2001 WI App 160, ¶10, 246 Wis. 2d 744, 632 N.W.2d 112. However, "[w]hen the exercise of discretion has been demonstrated, we follow a consistent and strong policy against interference with the discretion of the trial court in passing sentence[.]" *State v. Stenzel*, 2004 WI App 181, ¶7, 276 Wis. 2d 224, 688 N.W.2d 20.

¶35 Our review must start with the record. Prior to the sentencing hearing, the trial court ordered the Wisconsin Department of Corrections to prepare a detailed presentence investigation report (PSI) to provide the court with as much information about Wilson and his background as possible. Wilson also presented a private PSI to provide information in addition to that in the court-ordered PSI. The court-ordered PSI writer recommended life imprisonment without the possibility of release to extended supervision. The private-PSI writer opined that Wilson should not be confined for life, but should instead be eligible for release after approximately 20 years.

¶36 At the sentencing hearing, Riley's family members spoke to the trial court and requested life imprisonment without the possibility of release. The State requested the same sentence. Wilson, through his attorney, argued that he should

14

be ordered eligible for release. Trial counsel highlighted Wilson's age, his remorse, his troubled childhood, his relatively light criminal history, and other mitigating factors on his behalf. Wilson had the opportunity, through trial counsel, to comment on and make corrections to the court-ordered PSI. He presented numerous letters vouching for his good character, and also had the opportunity to address the court directly, which he did prior to the court's imposition of sentence.

¶37 As stated above and as relevant to Wilson's argument here, the trial court imposed life imprisonment without the possibility for release on extended supervision for Wilson's role in the shooting death of Riley. In imposing sentence, the court accurately set forth the appropriate sentencing considerations. Although it noted that it considered all of the necessary factors, the court explained that punishment was the primary focus of its sentence because the offense was so grave and Wilson's decision-making so awful.

¶38 After careful review, we conclude that Wilson's claim that "the [trial] court provided little connection between the offense itself, Mr. Wilson's character, and the ultimate sentence ordered[,]" is unsupportable on this record. "What constitutes adequate punishment is ordinarily left to the discretion of the trial judge." *State v. Cummings*, 2014 WI 88, ¶75, 357 Wis. 2d 1, 850 N.W.2d 915. Contrary to Wilson's position, the court thoroughly explained on the record why it believed life without the opportunity for release to supervision was warranted. For example, it explained that critical to the sentence was that the only reason none of Wilson's bullets hit Riley or Emily was the mere fact that Wilson did not know how to operate the gun he was using; his failure to have actually shot Riley or Emily was not through any concern he had for the victims. Also key in the court's determination was that Wilson helped plan the crime and showed up

15

armed, to attempt it twice in approximately 24 hours. The court stressed how the first failed attempt could have served as a wake-up call to Wilson that the plan was a bad one, but it did not. Based on our review of the record, we conclude that the court made appropriate sentencing considerations, did not consider inappropriate factors, and did not erroneously exercise its discretion.

¶39 Finally, we briefly address Wilson's contention that his sentence was unduly harsh and excessive. Specifically, Wilson argues that his sentence is unfair in light of his codefendants' sentences. He complains that Sanchez and Hudson both pled to one count of felony murder and one count of first-degree reckless injury, with the remaining charges dismissed and read in. Sanchez was sentenced to a total of 15 years initial confinement and 15 years of extended supervision, while Hudson received 20 years of initial confinement and 15 years extended supervision between the 2 counts. May, who did not go to Riley's house with the other codefendants, pled to one count each of conspiracy to commit armed robbery and misdemeanor bail jumping. She was sentenced to a total of nine years of initial confinement and five years extended supervision. Wilson argues that it is unfair that he received greater punishment than these codefendants. We disagree.

¶40 No two defendants present the same facts and considerations before a sentencing court. *Gallion*, 270 Wis. 2d 535, ¶48. Participating in the same crime does not require the same sentence. *Jung v. State*, 32 Wis. 2d 541, 548, 145 N.W.2d 684 (1966). "Individualized sentencing" based on relevant facts and factors, sentencing objectives, and statutory guidelines is a "cornerstone to Wisconsin's criminal justice jurisprudence." *Gallion*, 270 Wis. 2d 535, ¶¶46, 48. Therefore, intrinsically, it is not harsh or unconscionable that Wilson's sentence was longer than his codefendants' sentences.

¶41    Moreover, Harris received the same sentence as Wilson, and the trial court gave a reasonable explanation for why Wilson received the same sentence as Harris, but a longer sentence than the others involved in this offense.  Not all the codefendants were similarly situated as to culpability here.  The court found Wilson's behavior to be much more similar to Harris' than to the others.  Harris also received a life sentence without the possibility of extended supervision.  Wilson has failed to persuade us that resentencing is warranted for any reason.

## CONCLUSION

¶42    For the foregoing reasons, we affirm the judgment of conviction as to all four counts and the order denying the postconviction motion.  Wilson has failed to meet his burden of establishing that the results of his jury trial would have been any different absent errors in jury instructions, or that trial counsel should have objected to certain remarks by the prosecutor.  He also fails to persuade us that the trial court erroneously exercised its sentencing discretion or his sentence to life in confinement was unduly harsh or excessive.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.